## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

**XTEC, INC.,**

      Plaintiff,

v.

**HEMBREE CONSULTING
SERVICES, INC.**, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** came before the Court upon Defendants, Hembree Consulting Services,

Inc. and Larry Hembree's (collectively, "Defendants[']") Renewed Motion for Judgment as a

Matter of Law ("JMOL Motion") [ECF No. 352] and Alternative Motion for New Trial or

Damages Reduction ("New Trial Motion") [ECF No. 353], both filed on December 16, 2015.

The motions are little more than placeholders; after receiving the requested transcripts of the

trial, Defendants filed accompanying memoranda for both motions on February 8, 2016.  (*See*

[ECF Nos. 385, 386]).[1]  On March 9, 2016, Plaintiff, XTec, Inc. ("XTec") filed a Response . . .

("JMOL Response") [ECF No. 397] to the JMOL Motion, as well as a Response . . . ("New Trial

Response") [ECF No. 395] to the New Trial Motion.  On March 21, 2016, Defendants filed a

Reply . . . ("JMOL Reply") [ECF No. 399] to the JMOL Motion and a Reply . . . ("New Trial

Reply") [ECF No. 401] to the New Trial Motion.  The Court has carefully considered the parties'

submissions, the record, and applicable law.

---

[1] Citations to the JMOL Motion and New Trial Motion refer to the memoranda, not the motions
themselves.

# I.  BACKGROUND

This case involves claims Defendants, Hembree Consulting Services, Inc. ("HCSI"), and its president and sole shareholder, Larry Hembree ("Hembree"), misused XTec's proprietary software and engaged in unfair business practices.  (*See generally* Compl. [ECF No. 1-1]).  The Court assumes the reader's knowledge with the intricate facts of the case (*see* Order ("Summary Judgment Order") [ECF No. 220]), but provides a brief background for the purpose of the instant Order.

Hembree worked for the United States Navy for a number of years on electronic security and enterprise access control systems, during which time he built a professional relationship with Jeff Huskey ("Huskey"), a Navy employee who later became the Chief Information Officer at Commander, Navy Installations Command ("CNIC").  (*See* Defendants' Amended Counterclaim [ECF No. 51] ¶¶ 6–7).  In 1997, Hembree left the Navy and formed Hembree & Associates, Inc. ("H&A") to develop a smart card business, and there he met David Fisher ("Fisher"), who later created CardSmart Technologies, Inc.  (*See id.* ¶ 8).  In 2000, Hembree sold H&A to XTec.  (*See id.*).

XTec specializes in the security access and authentication industry and markets its own proprietary software, hardware, and firmware to its clients.  (*See* Compl. ¶ 6).  XTec named Hembree Director of Government Initiatives; Hembree owns 40,000 shares of XTec stock.  (*See* Defs.' Am. Countercl. ¶ 8).  In early 2001, XTec entered into a joint venture with CardSmart.  (*See* Compl. ¶ 9).  In 2003, Hembree resigned from XTec, and in 2004, formed HCSI.  (*See* Defs.' Am. Countercl. ¶¶ 1, 9).  The joint venture relationship between XTec and CardSmart spanned from 2002 through 2009, during which time the entities performed work for the Navy involving a product known as Enabler 1.0.  (*See* Compl. ¶ 10).

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

In July 2011, XTec filed a lawsuit against CardSmart and Fisher (*see* Defendants' Notice of Removal [ECF No. 1] in *XTec, Inc. v. CardSmart*, Case No. 11-cv-22866-FAM (S.D. Fla.) (the "CardSmart Litigation")), alleging CardSmart and Fisher wrongfully copied XTec's proprietary technology from XTec software already in use by the Navy to create and sell an updated version of Enabler 1.0 to the Navy, known as Enabler 3.0 (*see generally* CardSmart Litigation, Complaint [ECF No. 1-2]).[2]  On December 12, 2013, XTec filed this lawsuit against Defendants, on substantially similar grounds.  (*See generally* Compl.).  XTec brought the following claims against Defendants: (1) violation of the Florida Uniform Trade Secrets Act, Florida Statutes section 688.01 *et seq.* ("FUTSA"); (2) violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes section 501.201 *et seq.* ("FDUTPA"); (3) defamation; and (4) common law trade libel.  (*See id.* ¶¶ 37–81).  On August 5, 2014, Defendants filed an Amended Counterclaim against XTec for defamation and several other violations, alleging XTec's counsel, namely Eduardo Rasco ("Rasco") and Steve Bimston ("Bimston"), sent a document called the Kennedy Report to Navy personnel in the course of their representation of XTec in the CardSmart Litigation.  (*See* Defs.' Am. Countercl. ¶ 44).  Defendants allege the Kennedy Report contained information that was confidential and defamatory to Defendants.  (*See id.* ¶¶ 46–47).

On October 30, 2015, during the jury trial, Defendants moved for judgment as a matter of law on XTec's claims, and the Court held a hearing on the motion.  (*See* [ECF No. 308]; *see also* Defendants' Motion for Judgment as a Matter of Law . . . ("Original JMOL Motion") [ECF No. 306]).  The Court denied the Original JMOL Motion on November 2, 2015, allowing Defendants to renew the motion post-judgment.  (*See* Order [ECF No. 310]).  On November 17, 2015, after a

---

[2] On December 29, 2014, the parties to the CardSmart Litigation entered into a Stipulated Final Judgment Granting Permanent Injunctive Relief [ECF No. 480].

seventeen-day trial, the jury returned a verdict in favor of XTec, and against Defendants, on all of XTec's claims and Defendants' defamation counterclaim.  (*See generally* Verdict Form ("Jury Verdict") [ECF No. 331]).  With respect to the misappropriation of trade secrets claim, the jury found Defendants' actions were "willful and malicious," and awarded XTec $4,000,000 for unjust enrichment and $1,000,000 for actual damages.  (*Id.* 2).  Concerning the defamation claim, the jury awarded XTec $250,000 in nominal damages.  (*See id.* 5).  Regarding Defendants' defamation counterclaim, the jury found Defendants failed to prove Rasco and Bimston acted as XTec's agents in disclosing the Kennedy Report to the Navy.  (*See id.* 6).  The Court entered final judgment on November 18, 2015.  (*See* Final Judgment [ECF No. 337]).

In their renewed JMOL Motion and New Trial Motion, Defendants ask the Court for judgment in their favor as a matter of law on all of XTec's claims, or alternatively to grant a new trial on XTec's claims and Defendants' defamation counterclaim.  (*See generally* JMOL Mot.; New Trial Mot.).  If the Court declines to grant either of these forms of relief, Defendants request the Court reduce the jury's award of nominal defamation damages from $250,000 to $1.  (*See* New Trial Mot. 9–10).

## II.   LEGAL STANDARDS

### A.  Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(b) governs a renewed motion for judgment as a matter of law.  Under this standard, a "district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action."  *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) (citation omitted).  Conversely, the court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an

essential element of the plaintiff's case." *Id.* (citations omitted). "Although [the court] look[s] at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1312 (11th Cir. 2006) (quoting *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000) (alterations added)).

### B.  New Trial

Motions for a new trial are governed by Federal Rule of Civil Procedure 59(a), and may be granted "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).  Although a comprehensive list of the grounds granting a new trial is elusive, the Supreme Court has held that a motion for a new trial may rest on the fact "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  "[W]hen considering a motion for new trial, the trial judge may weigh the evidence, but it is proper to grant the motion only if the verdict is against the great, not just the greater, weight of the evidence." *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988) (citing *Watts v. Great Atl. & Pac. Tea Co.*, 842 F.2d 307, 310 (11th Cir. 1988) (alteration added)).

### C.  Motion to Alter or Amend a Judgment

Federal Rule of Civil Procedure 59(e) governs motions to alter or amend judgments.  The Eleventh Circuit has recognized only two grounds for granting a Rule 59 motion — newly discovered evidence or manifest errors of law or fact.  *See Saridakis v. S. Broward Hosp. Dist.*, No. 08-62005-Civ, 2010 WL 2274955, at *5 (S.D. Fla. June 7, 2010) (citing *Arthur v. King*, 500

F.3d 1335, 1343 (11th Cir. 2007)). "A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Id.* (citation and internal quotation marks omitted).

## III.   ANALYSIS

### A.   JMOL Motion

#### 1.   The Misappropriation Verdict

Defendants request the Court grant them judgment as a matter of law on XTec's misappropriation claim. (*See* JMOL Mot. 3). In support, they set forth four main arguments: (1) XTec provided insufficient evidence at trial for the jury to find Defendants misappropriated XTec's trade secrets, particularly that Defendants acted willfully and maliciously in doing so; (2) XTec failed to establish CardSmart used a substantial portion of Enabler 1.0 in creating Enabler 3.0; (3) XTec failed to present legally sufficient evidence proving the copied software was its trade secret; and (4) XTec failed to adequately prove actual damages, unjust enrichment, and causation. (*See generally id.* 3–20). The Court addresses each argument in turn.

##### i.   Evidence Establishing Misappropriation, Willfulness, and Malice

Under the FUTSA, the elements of a misappropriation claim include: "(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy and (2) the secret was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it." *Axiom Worldwide, Inc. v. HTRD Grp. Hong Kong Ltd.*, No. 8:11-CV-1468-T-33TBM, 2013 WL 2712787, at *4 (M.D. Fla. June 12, 2013). The FUTSA further states: "If *willful and malicious* misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made [under the previous subsection]." FLA. STAT. § 688.004 (alteration and emphasis added).

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

Defendants argue XTec provided insufficient evidence for the jury to find Defendants were responsible for, or even aware of, CardSmart's copying of portions of Enabler 1.0 (the "CardSmart Theory"). (*See* JMOL Mot. 4). Consequently, Defendants assert the jury could not have reasonably found *Defendants* used improper means to obtain XTec trade secrets, nor could it have found Defendants acted willfully and maliciously in doing so. (*See id.* 4–5). In response, XTec contends: (1) Defendants have waived their arguments on this point because they did not raise them in their Original JMOL Motion; and (2) in any event, XTec provided a plethora of evidence supporting the finding Defendants were aware of, and participated in, CardSmart's misappropriation. (*See* JMOL Resp. 3–4).

a) *Potential Waiver of Arguments Raised for the First Time in Second JMOL Motion*

XTec argues Defendants waived their CardSmart Theory, willfulness, and malice-related arguments by not raising them in their Original JMOL Motion. (*See id.* 3, 6 n.10). In the Original JMOL Motion, Defendants argued the FUTSA claim failed as a matter of law because XTec had no trade secret rights to Enabler 1.0 and could not prove causation or damages; but they did not address the CardSmart Theory or the willfulness and malice issues. (*See* Original JMOL Mot. 2). Defendants insist these arguments, while not explicitly raised in the Original JMOL Motion, were subsumed within their broader argument XTec failed to present legally sufficient evidence for the jury to find Defendants liable on the FUTSA claim. (*See* JMOL Reply 1–4; *see also* Original JMOL Mot. 2).

The Eleventh Circuit has held: "[A]ny renewal of a motion for judgment as a matter of law under Rule 50(b) must be *based upon the same grounds* as the original request for judgment as a matter of law made under Rule 50(a) at the close of the evidence and prior to the case being submitted to the jury." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004)

(alteration and emphasis added).  "This rule ensures that opposing counsel will not be ambushed or sandbagged regarding the sufficiency of the evidence adduced at a point in the trial proceedings when it is too late to address possible insufficiencies." *Id.* (internal quotation marks omitted).  "Strict identity of issues, however, is not required. So long as they are 'closely related,' such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party, the purposes of the rule will be satisfied." *Howard v. Walgreen Co.*, 605 F.3d 1239, 1243 (11th Cir. 2010).

Defendants' CardSmart Theory is sufficiently closely related to the FUTSA arguments Defendants addressed in their Original JMOL Motion such that XTec is not "ambushed or sandbagged" by Defendants raising the argument now. *Doe*, 394 F.3d at 903.  Essentially, the CardSmart Theory is simply another way for Defendants to argue the evidence at trial was insufficient to support a finding Defendants violated the FUTSA.  In contrast, the willfulness and malice issues are sufficiently distinct from the FUTSA argument raised by Defendants in the Original JMOL Motion.  As Defendants themselves acknowledge, these issues require the Court to analyze whether XTec has met a higher standard of establishing Defendants' conduct was particularly egregious.  (*See* JMOL Mot. 6 ("'Willful' and 'malicious' are separate, conjunctive concepts — both of which must be established by that more stringent level of proof." (internal citation omitted))).  Further, as the FUTSA states, the willfulness and malice inquiry is relevant to the separate issue of whether the Court awards exemplary damages. *See* FLA. STAT. § 688.004 ("If *willful and malicious* misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made [under the previous subsection]." (emphasis and alteration added)).

Requiring XTec to address these issues now, when Defendants failed to raise them during trial, either in their Original JMOL Motion or orally at the hearing on the motion, would unfairly "ambush" XTec.[3]  *See S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 813 (11th Cir. 2015) (on a Rule 50(b) motion, declining to consider the defendant's challenge to the sufficiency of the evidence supporting his participation in a fraudulent scheme where the defendant failed to raise this issue in his Rule 50(a) motion); *see also Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 717 n.3 (11th Cir. 2002) ("[The defendant] also argues that [the plaintiff] failed to present legally sufficient evidence for a reasonable jury to award compensatory damages on his retaliation claim.  We will not entertain this argument, because [the defendant] raised this issue for the first time in its postverdict renewed motion for judgment as a matter of law." (alterations added)).  Thus, the Court will consider the CardSmart Theory as part of Defendants' FUTSA arguments in the present JMOL Motion, but will not consider the willfulness and malice-related arguments.

b)  *CardSmart Theory*

Under the CardSmart Theory, Defendants argue XTec essentially presented a case at trial blaming Defendants for CardSmart's misappropriation of XTec's data.  (*See* JMOL Mot. 4).  Specifically, Defendants contend it was undisputed at trial they were unaware CardSmart's engineer, James Wiley ("Wiley"), had copied any Enabler 1.0 code.  (*See id.*).  XTec vehemently

---

[3] Defendants argue their willfulness and malice-related issues are necessarily implicated in their original FUTSA arguments because XTec must meet a *higher* standard under this theory (clear and convincing evidence, according to Defendants) than under its regular FUTSA claim.  (*See* JMOL Reply 4).  Thus, if, as Defendants argue, XTec cannot meet its burden under its regular FUTSA claim, it certainly cannot meet the burden under the willful and malicious standard.  (*See id.*).  This argument, while interesting, fails to persuade.  Defendants could easily have addressed, or at least mentioned, the willful and malicious standard in their Original JMOL Motion along with their other FUTSA arguments, but they chose not to.  XTec was not put on notice of the need to bolster its evidence with respect to the willful and malicious standard before the close of trial.  The Court will not allow Defendants to raise the issue for the first time now.

disagrees, arguing Defendants' involvement in CardSmart's misappropriation was established through the following evidence: (1) Hembree requested access to the Pensacola server on CardSmart's behalf; (2) Defendants were less than forthright to XTec about the purpose for which such access was being sought; and (3) Defendants not only knew about the ongoing misappropriation by CardSmart, but they also bankrolled the project (*see* Pl.'s Ex. 62 [ECF No. 398] 13–16).  (*See* JMOL Resp. 3–5).  XTec further contends it was reasonable for the jury to disbelieve Hembree's assertion he did not know about the presence of human-readable source code on the Pensacola server due to his decades of information technology experience, as well as the lack of credibility rendered by his ghost-writing of emails.  (*See id.* 5–6).

Defendants concede Hembree requested CardSmart's access to the out-of-production Navy-owned Enabler server, but argue this act alone does not constitute misappropriation, in part because Hembree did not know there was proprietary information on the server.  (*See* JMOL Reply 2).  While Hembree adamantly stated he did not know there was proprietary information on the server provided to CardSmart, XTec presented sufficient evidence that would allow a reasonable jury to disbelieve Hembree's testimony — namely, that Hembree possessed significant knowledge of information technology (*see, e.g.*, Jury Trial Excerpt . . . ("Hembree Testimony Part I") [ECF No. 372] 20:14–21:10); and Defendants were less than forthright with XTec about the purpose for which access to the Pensacola server was sought (*see, e.g.*, Jury Trial Excerpt . . . ("Fernandez Testimony Part 1") [ECF No. 338] 118:9–119:15).  Because XTec has presented "enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case," judgment as a matter of law on this theory is unwarranted. *Pickett*, 420 F.3d at 1278 (citation omitted).

ii. Use of a Substantial Portion of Enabler 1.0 in Creating Enabler 3.0

Defendants further argue: (1) XTec failed to prove a substantial portion of any trade secret was used in Enabler 3.0; and (2) XTec failed to identify, with sufficient particularity, the specific code it claimed to be a trade secret. (*See* JMOL Mot. 9–11). Regarding the first point, Defendants contend XTec's expert testified "considerably less than one percent" of the total Enabler 3.0 code was drawn from Enabler 1.0, and the other subjects of misappropriation were not proprietary information. (*See id.* 9 (quoting Jury Trial Excerpt . . . ("Eiras Testimony Part I") [ECF No. 316] 51:6–24)). XTec asserts Defendants mischaracterize and confuse the record on this issue. (*See* JMOL Resp. 8–9).

In the Eleventh Circuit, "a defendant is liable for the misappropriation of a trade secret only if the plaintiff can show that the defendant (1) disclosed information that enabled a third party to learn the trade secret *or* (2) used a 'substantial portion' of the plaintiff's trade secret to create an improvement or modification that is 'substantially derived' from the plaintiff's trade secret." *Penalty Kick Mgmt. Ltd. v. Coca-Cola Co.*, 318 F.3d 1284, 1293 (11th Cir. 2003) (emphasis added); *see also Jadael Inc. v. Elliott*, No. 6:05-CV-1623-ORLDAB, 2007 WL 2480387, at *8 n.6 (M.D. Fla. Aug. 29, 2007). The parties dispute whether XTec satisfied the second prong of the *Penalty Kick* case — that is, whether Defendants used a substantial portion of Enabler 1.0 to create Enabler 3.0.

The Court instructed the jury it could find misappropriation based on the first *Penalty Kick* prong — a defendant may be liable for misappropriation if he discloses "information that enabled a third party to learn the trade secret." *Penalty Kick*, 318 F.3d at 1293. Specifically, the jury instructions required the jury to determine whether Defendants "acquired, *or* disclosed, *or* used a substantial portion" of XTec's trade secrets in creating Enabler 3.0. (Court's Instructions

to the Jury ("Jury Instructions") [ECF No. 330] 4 (emphases added); *see also id.* 5 (instructing

the jury: "XTec must . . . prove these trade secrets were misappropriated by the Defendants

through improper acquisition of XTec's trade secrets, *or* improper disclosure of XTec's trade

secrets, *or* improper use of a substantial portion of XTec's trade secrets" (emphases and

alteration added))).

Indeed, XTec argues in its JMOL Response "the jury could reasonably infer

misappropriation based upon . . . Defendants' knowing . . . provision of access to Enabler 1.0

code and technical documentation to CardSmart during the development of Enabler 3.0."

(JMOL Resp. 8–9 (alterations added)).  The Court agrees, for the same reasons explained in the

CardSmart Theory section.  (*See supra* 9–10 (finding the jury could have reasonably concluded

Defendants knew there was proprietary information on the Pensacola server when they provided

access to CardSmart and obscured their reasons for requesting access from XTec)).  Because: (1)

the jury instructions allowed the jury to consider both *Penalty Kick* theories of misappropriation;

(2) *Penalty Kick* allows for a finding of misappropriation if *either* of the two theories is satisfied;

and (3) the jury could have reasonably concluded the first *Penalty Kick* theory was satisfied, the

Court need not address the second *Penalty Kick* theory — whether XTec adequately established

a substantial portion of Enabler 1.0 was used in Enabler 3.0.

Defendants further argue XTec has failed to identify its trade secret with sufficient

particularity.  (*See* JMOL Mot. 10 (citing *Revello Med. Mgmt., Inc. v. Med-Data Infotech USA,

Inc.*, 50 So. 3d 678, 679 (Fla. 2d DCA 2010) ("[T]he plaintiff must identify with reasonable

particularity the nature of the trade secret involved." (alteration added)))).  According to

Defendants: (1) XTec failed to take a proper forensic image of the Pensacola server and thus

could only provide a reconstructed version of what it believes was on the server; and (2) XTec's

alleged trade secret was a moving target.  (*See id.* 10–12).  As XTec points out, Defendants already raised these exact two arguments at the summary judgment stage, and the Court rejected them.   (*See* Summ. J. Order 18–20 (rejecting Defendants' arguments and noting XTec sufficiently described the trade secret for which it sought protection)).

In the present motion, Defendants merely refer to a few more facts and cases than presented in their earlier summary judgment motion — none of which alter the Court's conclusion on this issue.  For example, Defendants attempt to bolster their "moving target" argument by asserting XTec altered its jury-instruction definition of its trade secrets up until the end of trial, when it defined the trade secrets as the "entirety of the AuthentX system, confidential source code, system architecture, and technical infrastructure, as a compilation." (Supplemental Verdict Interrogatory . . . [ECF No. 332] 1; *see also* JMOL Mot. 12).  However, this definition is not so unlike XTec's original jury-instruction definition such that it would unfairly surprise Defendants at trial.   (*See* Parties' Revised Preliminary and Final Jury Instructions . . . [ECF No. 250] 18 (defining the alleged trade secrets as "the AuthentX[TM] system, business strategies, industry contacts, internal operating procedures and methods, confidential source code, technical infrastructure, and confidential databases and tables, among other documents.")).

Both definitions claim the entire AuthentX system as a trade secret, which — as the Court held earlier in the Summary Judgment Order — is permissible.  (*See* Summ. J. Order 19–20); *see also Decision Insights, Inc. v. Sentia Group, Inc.*, 311 F. App'x 586, 592 (4th Cir. 2009) (court acknowledged a "software compilation" can be found to be a trade secret and the plaintiff's production of its source code was an acceptable method of identifying the trade secret); *Harbor Software, Inc. v. Applied Sys., Inc.*, 936 F. Supp. 167, l72 (S.D.N.Y. 1996)

("[C]ase law supports the proposition that the overall *design* of a software program may be protectable as a trade secret even if the individual *components* of that program are common knowledge in the programming industry" (emphases and alteration in original)).

Defendants' additional cases likewise fail to alter the Court's conclusion on this issue. In their JMOL Motion, Defendants cite a handful of non-binding cases that support the general proposition a party must identify its trade secrets with sufficient particularity. *See Marine Travelift, Inc. v. Marine Lift Sys., Inc.*, No. 10-C-1046, 2013 WL 6255689, at *5 (E.D. Wis. Dec. 4, 2013); *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992) ("It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated."); *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 583 (7th Cir. 2002) (finding a 43-page description of the methods and processes underlying the plaintiff's software package not specific enough); *DSMC, Inc. v. Convera Corp.*, 479 F. Supp. 2d 68, 78 (D.D.C. 2007) ("Unlike the plaintiff in *IDX Systems,* who just identified its entire software product as a trade secret without pointing to specific features that were trade secrets . . . DSMCi has sufficiently identified its alleged trade secrets." (alteration added; internal citation omitted)).

XTec sufficiently identified its trade secrets at trial, as it did at the summary judgment stage (*see* Summ. J. Order 18–20). (*See* Fernandez Test. Part I 8:10–17:4 (describing the AuthentX system); *see also* Jury Trial Excerpt . . . ("Eiras Testimony Part II") [ECF No. 339] 64:12–16 (describing his conclusion pieces of XTec's source code were copied directly and the existing AuthentX software was used as an implementation guide at the very least)). Accordingly, judgment as a matter of law for Defendants on this issue is inappropriate.

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

iii.   Evidence Establishing the Copied Software was XTec's Trade Secret

The FUTSA defines a "trade secret" as information that "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and . . . [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." FLA. STAT. § 688.002(4) (alterations added).   Thus, if a trade secret is either readily ascertainable, or the plaintiff fails to take reasonable efforts to maintain the secrecy of its trade secret, a misappropriation claim will fail. *See, e.g.*, *Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 610 F. App'x 881, 885–86 (11th Cir. 2015) (granting summary judgment for the defendant on a trade secret misappropriation claim where the plaintiff did not take adequate steps to maintain the secrecy of its product).

Defendants assert XTec failed to establish it took reasonable steps to maintain the secrecy of Enabler 1.0's proprietary characteristics and thus did not prove it owned a trade secret.   (*See* JMOL Mot. 13).   Specifically, Defendants argue XTec: (1) failed to preserve any data rights in its Enabler contracts with the Navy; (2) failed to mark as confidential or proprietary any Enabler source code and related documentation delivered to the Navy; and (3) gave the Navy and CardSmart unrestricted access to Enabler 1.0 source code without advising either entity XTec claimed any proprietary rights in the source code.   (*See id.*).

XTec presented sufficient evidence at trial that a reasonable jury could have rejected — and did reject — Defendants' aforementioned arguments.   In particular, Defendants argued XTec failed to preserve any data rights in its Enabler contracts with the Navy, relying upon several federal regulations that require contractors to identify proprietary information as such when developing *noncommercial* software.   (*See* JMOL Mot. 14–15 (citing 48 C.F.R. § 52.227-14 *et*

15

*seq.*)).  But XTec presented evidence upon which a reasonable jury could conclude it was not required to comply with these regulations, as AuthentX was a *commercial* product.  *See* 48 C.F.R. § 8.402(a) (describing how GSA schedules provide a process for the government to obtain commercial supplies); (*see also* Jury Trial Excerpt . . . ("Fernandez Testimony Part II") [ECF No. 362] 10:8–12:22 (explaining XTec sells its AuthentX appliances pursuant to GSA schedules to protect its intellectual property rights)).  XTec bolstered its claim AuthentX was a commercial product by offering testimony the product was developed entirely at private expense and was sold to commercial customers prior to the Enabler project commencing in 2004.  (*See* Jury Trial Excerpt . . . ("Arner Testimony Part I") [ECF No. 340] 26:15–26:20 (stating the government did not pay for any portion of the AuthentX development); *see also* Jury Trial Excerpt . . . ("Arner Testimony Part VI") [ECF No. 365] 22:1–25).  Consequently, the jury had sufficient evidence upon which to find XTec was not required to comply with the regulations cited by Defendants.

Second, Defendants argue XTec did not limit access to AuthentX or otherwise mark it to deter copying.  (*See* JMOL Mot. 16).  Defendants cite a string of cases, noting: "Clear authority holds that an idea is not reasonably maintained in requisite secrecy if disclosed . . . without an accompanying mechanism to maintain secrecy."  (*Id.* (citing, *e.g.*, *Laing v. BP Exploration & Prod. Inc.*, No. 8:13-cv-1041-T-23TGW, 2014 WL 272846, at *4 (M.D. Fla. Jan. 23, 2014) (alteration added); *see also Cubic Transp. Sys., Inc. v. Miami-Dade Cnty.*, 899 So. 2d 453, 454 (Fla. 3d DCA 2005))).  XTec responds it did not give the Navy root access to Enabler 1.0 servers.  (*See* JMOL Resp. 17 (citing Arner Test. Part I 129:10–16)).  Defendants' cases are arguably distinguishable because 48 C.F.R. section 27.402(b) obligates the government to

maintain the secrecy of proprietary data; thus, in this case, there *was* an accompanying mechanism to maintain AuthentX's secrecy.  (*See* JMOL Resp. 17–18).

Third, Defendants assert the Navy owned Enabler 1.0 and all of its source code; thus, none of it qualifies as a trade secret.  (*See* JMOL Mot. 17).  In support, Defendants rely on several emails among Navy personnel confirming the Navy owned Enabler 1.0, as well as Huskey's testimony stating he believed the Navy owned both Enabler 1.0 and its source code.  (*See id.* 17–18).  These emails pertain generally to Navy ownership of Enabler 1.0, rather than specifically to AuthentX — the software located on Enabler 1.0.  (*See, e.g.*, Defs.' Ex. 62 [ECF No. 383-13] (stating "ENABLER is a Government System, owned by the Navy")).  In fact, XTec concedes, "the Navy owns the servers, readers, and xNodes which comprise the Enabler 1.0 system, as well as the customized software layers;" yet, this does not mean it owns the AuthentX software, which acts as the operating system for Enabler 1.0.  (JMOL Resp. 19).  Further, regarding Huskey's testimony, the jury could have reasonably disbelieved Huskey's statements, given the evidence presented by XTec of his close working relationship with Hembree.  (*See, e.g.*, Jury Trial Excerpt . . . ("Hembree Testimony Part II") [ECF No. 375] 22:7–24:4 (describing Hembree ghostwriting emails for Huskey)).  Accordingly, the Court is not persuaded this argument weighs sufficiently in favor of finding against the existence of a trade secret.

Fourth, Defendants argue three portions of the Enabler 1.0 code used by CardSmart were not proprietary to XTec — namely, the LDAP schema (and OID), RBS (including cURL functions), and the getnumber function — thus, these items were not proprietary and not trade secrets.  (*See* JMOL Mot. 18).  In particular, Defendants contend Albert Fernandez ("Fernandez"), XTec's President and Chief Executive Officer, conceded the LDAP schema and OID were not proprietary, and XTec's expert testified the Enabler 1.0 RBS code was very

17

similar to the RBS code provided by the Navy.  (*See id.*).  Regarding the getnumber function, Defendants assert the trial record established the function was developed for the Navy and incorporated into program code owned by the Navy.  (*See id.* 19).  Regardless of the individual portions of Enabler 1.0 code discussed by Defendants, the trial record provided the jury with a reasonable basis to conclude CardSmart used Enabler 1.0/AuthentX code as a development guide to create Enabler 3.0.  (*See* Eiras Test. Part I 51:25–53:4).  Further, regarding the RBS function, one of XTec's witnesses testified the RBS code is not substantially similar to that provided by the Navy, as the data presented in the guide relied upon by Defendants is not code, but simply a specification for the developer.  (*See* JMOL Resp. 19 (citing Jury Trial Excerpt . . . ("Suzette Diaz Testimony") [ECF No. 371] 71:25–72:15)).

Viewing the evidence in a light most favorable to XTec, the Court is persuaded there is a sufficient factual basis such that a reasonable jury could have concluded XTec's actions, under the circumstances, were reasonable to maintain secrecy.  *See Pickett*, 420 F.3d at 1278 (noting that a court should deny the defendant's motion for judgment as a matter of law "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case").

iv.   Proof of Actual Damages, Unjust Enrichment, and Causation

a)   *Actual Damages*

Defendants argue XTec failed to prove it incurred actual damages from Defendants' misappropriation of its trade secrets.  (*See* JMOL Mot. 19–22).  Lost profits must be proven with reasonable certainty and be a natural consequence of the wrong.  *See Sihle Ins. Grp., Inc. v. Right Way Hauling, Inc.*, 845 So. 2d 998, 1001 (Fla. 5th DCA 2003); *see also Marshall Auto Painting & Collision, Inc. v. Westco Eng'g, Inc.*, No. 6:02CV-109-ORL22KRS, 2003 WL 25668018, at

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

*11 (M.D. Fla. May 8, 2003) ("In order to recover damages for lost profits, a jury must find that the wrongful act of the defendant proximately caused the damage. . . .  In other words, the lost profits must be a natural, proximate, probable or direct consequence of the defendant's negligent acts, and not a remote consequence thereof."  (alteration added; internal quotation marks and citation omitted)).  Further, "damages may not be awarded for lost profits when those profits are dependent on a party taking an action that it is unclear he would have taken." *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002).

Defendants assert XTec's alleged actual damages are predicated upon the belief XTec would have modified Enabler 1.0 to be JGS 2.0-compliant, and thus, the Navy would have continued purchasing Enabler 1.0 products.  (*See* JMOL Reply 10).  They contend XTec cannot maintain this fallacy, because the Navy gave it multiple chances to conform Enabler 1.0 to be JGS 2.0-compliant, and it failed to do so.  (*See id.*).  Therefore, Defendants argue XTec cannot maintain it suffered actual damages in the form of lost sales of a product it never created, given the Navy and/or other clients would have stopped purchasing Enabler 1.0 regardless of the creation of Enabler 3.0.  (*See id.*).

Defendants' primary evidentiary support for this argument is a December 9, 2010 email from Huskey to XTec personnel and Hembree, stating: "Stop purchasing, or installing any XTec Readers, XNodes or Servers, or any other access control products that are not JGS 2.0 compliant. . . .  Tony/Albert [XTec employees], I need you to respond to our requests with a timeline on when you can meet the JGS 2.0 by December 14, 2010."  (Defs.' Ex. 36 ("DX 36") [ECF No. 383-9] (alteration added)).  Tony, or Antonio Arner ("Arner"), XTec's Chief Financial Officer, testified XTec never responded to this directive in writing, even though XTec's employees understood failure to do so might end their new equipment sales to the Navy.  (*See* Arner

Testimony Part VI 214:7–216:11).  Rather, XTec chose not to conform to the JGS 2.0 system because it was not contractually required to do so and Fernandez disagreed with the underlying architecture of the system.  (*See id.* 215:13–21).[4]

XTec adamantly asserts its actual damages are warranted because JGS 2.0 compliance was simply a pretext Defendants used to push XTec out of business with the Navy.  (*See* JMOL Resp. 20).  Specifically, it argues Enabler 1.0 was fully JGS compliant, and XTec chose not to further modify Enabler 1.0 to conform to Hembree's desired architecture because it was not contractually obligated to do so.  (*See id.*).  Given the totality of XTec's evidence and theory at trial, the jury had a reasonable basis to reject the premise of Defendants' argument — that the Navy would have requested XTec utilize JGS 2.0 in the absence of Defendants' allegedly self-serving tactics.  (*See, e.g.*, Arner Test. Part VI 210:16–17 ("Had it not been for Enabler 3, Mr. Hembree and Mr. Fisher's involvement in this thing, Enabler 1 would have been JGS."); *see id.* 215:5–9 ("The underlying reason why this [December 9, 2010 email] is sent is for the existence of Enabler 3 and the implementation of JGS2 in Enabler 3.  Had there not been an Enabler 3, Enabler would have been the JGS mechanism." (alteration added))).[5]  Once this premise was rejected, the jury could have reasonably surmised the following as to causation: (1) Defendants

---

[4] Defendants also argue XTec is not entitled to actual damages for a lost sale of readers in the Northwest region of the United States, given Defendants never consummated this sale.  (*See* JMOL Mot. 21).  However, XTec noted the record established Defendants "slow[ed] things down" in the Northwest region (Pl.'s Ex. 110 (alteration added)); thus, the jury could have concluded XTec would have made these sales if Defendants had not interfered.

[5] XTec also points out the only evidence Defendants presented at trial regarding the Navy's future requirements for the Enabler program came from Hembree himself, and the jury chose to disbelieve his testimony.  (*See* JMOL Resp. 20).  Ultimately, this issue comes down to whether the jury credited Fernandez and Arner's testimony above Hembree's.  The Court declines to second-guess the jury's credibility determinations, so long as adequate evidence supports them.  *See Johnson v. Clark*, 484 F. Supp. 2d 1242, 1245 (M.D. Fla. 2007) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" (internal citation and alteration omitted)).

misappropriated parts of Enabler 1.0 to create Enabler 3.0; (2) Defendants then convinced the Navy to adopt the JGS 2.0 system and used it as a pretext to push Enabler 1.0 out of the industry; and (3) XTec suffered actual damages as a result of Enabler 3.0's replacement of Enabler 1.0. Because these actual damages are a "natural, proximate, probable or direct consequence of the misconduct at issue," they survive Defendants' motion for judgment as a matter of law. *See Marshall Auto Painting*, 2003 WL 25668018, at *11.[6]

b) *Unjust Enrichment*

Defendants further argue the jury's award of unjust enrichment damages to XTec was either improper or excessive. (*See* JMOL Mot. 22). First, they assert Defendants did not "receive something of value for which they should have paid," because Defendants simply used Navy software, which they had the right to use. (*Id.* (citing *Philip Morris, Inc. v. Brown & Williamson Tobacco Corp.*, 641 F. Supp. 1438, 1489 (M.D. Ga. 1986))). This argument is unconvincing. As set forth *supra*, XTec presented evidence from which the jury could reasonably conclude Defendants misappropriated XTec's trade secrets. Thus, XTec appropriately sought unjust enrichment damages.[7]

---

[6] This analysis also applies with respect to Defendants' argument regarding lack of causation. (*See* JMOL Mot. 23–24). Indeed, *Hennegan Co. v. Arriola*, cited by Defendants, is distinguishable. (*See id.* 24 (citing 855 F. Supp. 2d 1354 (S.D. Fla. 2012))). There, the court found the plaintiff failed to prove causation and actual damages because the defendant did not refer the plaintiff's clients to another service-provider until after the clients had already rejected the plaintiff's offers. *See Hennegan*, 855 F. Supp. 2d at 1361. Here, by contrast, the jury could have reasonably found Defendants pushed XTec out of its relationship with the Navy. This logic applies to the causation element in all of XTec's claims.

[7] The Court is similarly unpersuaded by Defendants' argument the amount of unjust enrichment damages should be reduced because less than one percent of XTec's proprietary source code was copied. (*See* JMOL Mot. 22). As discussed, the jury received evidence suggesting CardSmart utilized Enabler 1.0 as a template for creating Enabler 3.0. (*See* Eiras Test. Part II 64:12–16 (describing his conclusion that pieces of XTec's source code were copied directly and the existing AuthentX software was used as an implementation guide at the very least)). Thus, this case differs from *02 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005), where the jury found that only five of the eleven trade secrets were misappropriated, and only the misappropriation of one of them resulted in the defendant being unjustly enriched.

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

Defendants next argue XTec's expert, Barry Mukamal ("Mukamal"), improperly included some variables in his unjust enrichment calculation — namely, revenue related to a program called the Funeral Honors Program that CardSmart developed on its own; and revenue paid by the Navy to HCSI as the contractor supervising XTec for work on Enabler 1.0. (*See* JMOL Mot. 22–23). In his testimony, Mukamal clarified he excluded any Funeral Honors-related revenue and other expenses that occurred prior to October 1, 2009 — the approximate time of the alleged misappropriation — and only included such revenue and expenses afterwards because the Funeral Honors Program then became part of the Enabler 3.0 system and is thus "fruit from a direct misappropriation." (Jury Trial Excerpt . . . ("Mukamal Testimony") [ECF No. 392] 33:2–35:14; *see also id.* 53:23–54:4). Mukamal also clarified he excluded any revenues related to Enabler 1.0. (*See id.* 36:1–20).

It is entirely possible the jury disagreed with Mukamal on this point and reduced its unjust enrichment damages accordingly. At closing argument, XTec asked the jury to find Defendants were unjustly enriched by $4.5 million; however, the jury only awarded XTec $4 million. (*See* Jury Verdict 2). Defendants do not specify, in their briefing, the full value of the Funeral Honors Program, particularly the revenues derived from the program post-October 1, 2009, or the value of their other requested reductions, so it is difficult to assess with certainty whether the jury already deducted this amount from the original damages sought. Even if the jury did not deduct for this amount, the jury could reasonably have found Mukamal's testimony credible on this point and therefore decided against making such a deduction. *See Johnson*, 484 F. Supp. 2d at 1245. Accordingly, the Court declines to further reduce the jury's award of unjust enrichment damages.

22

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

2.   The FDUTPA Verdict

Defendants present three arguments for why XTec's FDUTPA claim fails as a matter of law: (1) it is duplicative of XTec's FUTSA claim; (2) XTec failed to prove Defendants acted deceptively; and (3) the jury did not award XTec damages for its FDUTPA claim.   (*See* JMOL Mot. 25–26).

i.   Duplication of the FUTSA Claim

Defendants first argue XTec's FDUTPA claim fails as a matter of law because it is duplicative of and barred by XTec's FUTSA claim.   (*See* JMOL Mot. 25).[8]   The FUTSA displaces "conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret," but does not affect other "civil remedies that are not based upon misappropriation of a trade secret."   FLA. STAT. § 688.008.   "In order to pursue claims for additional tort causes of action where there are claims for misappropriation of a trade secret, there must be *material distinctions* between the allegations comprising the additional torts and the allegations supporting the FUTSA claim."   *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007) (emphasis added).   To conduct this analysis, the Court must compare the allegations of the FDUTPA claim and the FUTSA claim to determine if the allegations are separate and distinct.   *See Living Color Enter., Inc. v. New Era Aquaculture, Ltd.*, No. 14-62216-CIV, 2015 WL 1526177, at *5 (S.D. Fla. Apr. 3, 2015) (citing *American Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005)).

A review of the Complaint narrowly reveals XTec's FDUTPA claim is distinct from its FUTSA claim, and thus preemption is not warranted.   (*See generally* Compl.).   The FUTSA claim ("Count I") alleges Defendants and CardSmart misappropriated XTec's trade secrets (*see*

---

[8] Defendants incorporated three pages of argument by reference from their Original JMOL Motion.   (*See* JMOL Mot. 25).   The Court notes its strong disapproval of this practice, particularly where it gave the parties a liberal 30-page limit for each memorandum.   (*See* Order [ECF No. 346]).

*id.* ¶¶ 37–47), and states Defendants "unlawfully utilized XTec's trade secrets to establish their

own competing business relationship with the U.S. Navy" (*id.* ¶ 46). XTec's FDUTPA claim

("Count II") relies on substantially similar allegations (and facts), with the additional assertion

Defendants wrongfully solicited CardSmart as a subcontractor after the termination of the joint

venture between CardSmart and XTec, for the purpose of using CardSmart's knowledge of

XTec's proprietary trade secrets to create a competing product. (*See id.* ¶¶ 53–54). This

assertion alone would be insufficient to distinguish the FDUTPA claim from the FUTSA claim,

as Defendants' solicitation of CardSmart was only wrongful because it was done with the intent

to misappropriate XTec's trade secrets. In fact, XTec conceded as much in an earlier filing. (*See*

Response . . . ("MSJ Response") [ECF No. 176] 18 ("XTec is not suing Defendants simply

because Defendants competed with XTec; instead, XTec is pursuing its FDUTPA claim because

Defendants knowingly solicited CardSmart to develop a competing solution under circumstances

whereby CardSmart was contractually prohibited from capitalizing upon *its prior exposure to*

*XTec's trade secrets*." (emphasis added))).

However, in support of its FDUTPA claim XTec also alleged Defendants "engaged in

unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or

practices." (Compl. ¶ 55). An example found earlier in the Complaint states:

> [P]ursuant to Hembree and HCSI's heavy involvement in the Enabler 1.0 project since
> its inception, they were able to arrange for Fisher and CardSmart to gain physical and
> electronic access to Enabler 1.0 servers. Such access was obtained under the guise of
> routine training, with the ulterior motive of allowing Fisher and CardSmart to closely
> analyze and reproduce Enabler 1.0's functionality.

(*Id.* ¶ 20 (alteration added)).

Further, at a hearing on Defendants' Original JMOL Motion, the Court asked counsel for

XTec to define how its FDUTPA claim was distinct from its FUTSA claim, and counsel

responded: "It is the *manner* in which [Defendants] gained access to the code.  The manner in which [Defendants] got access in order to derive Enabler 3 code" (alterations and emphasis added).[9]  Thus, contrary to Defendants' position (*see* JMOL Reply 12), XTec's FDUTPA theory of liability based on Defendants' deception finds roots in the Complaint and was clarified during trial.[10]

Such assertions are sufficient to materially distinguish XTec's FDUTPA claim from the FUTSA claim.  *See New Lenox Indus.*, 510 F. Supp. 2d at 908 (finding material differences between fraudulent inducement claim and FUTSA claim where:

> The crux of Plaintiff's fraud in the inducement claim is that [the defendant] misled Plaintiff into believing that NLI's technology was being evaluated by an independent industry expert . . . in order to obtain access to Plaintiff's confidential proprietary information.  In contrast, the gist of Plaintiff's misappropriation of trade secret claim under FUTSA is that Defendants disclosed the unlawfully obtained trade secrets to others in the airbag industry and utilized the information to compete with Plaintiff.

(alterations added)); *see also Am. Honda Motor Co.*, 390 F. Supp. 2d at 1180–81 (finding FDUTPA, fraud, and negligent misrepresentation counterclaims distinct from FUTSA counterclaim where the plaintiff made false representations that "induced the Defendants to divulge its [sic] information, to conduct further research into the system, and to forego other business relationships relating to the development, funding, or sale of the system").  As in these cases, the FDUTPA claim is sufficiently distinct from the FUTSA claim, and thus preemption under Florida Statutes section 688.008 is not shown.

---

[9] The transcript of this particular hearing is not electronically available.  This quote comes from the Court's internal transcripts.

[10] Defendants also argue this "deception" theory is duplicative of XTec's FUTSA claim because it was based on the same alleged misconduct XTec contends constituted the "improper means" required to support a trade secrets misappropriation.  (*See* JMOL Reply 12–13).  While an interesting argument, the Court finds the *New Lenox* and *American Honda Motor Company* cases dispositive on this issue.  *See infra*.

ii.   Lack of Evidence of Deception

Defendants next argue even if XTec's FDUTPA claim is not preempted by the FUTSA, XTec still failed to prove Defendants acted deceptively.   (*See* Original JMOL Mot. 15). Defendants assert the evidence shows they repeatedly informed XTec if it did not update Enabler 1.0 and make it compliant with the Navy's requirements, the Navy would replace it.   (*See id.*). XTec responds the trial record demonstrates Defendants indeed acted deceptively in numerous ways from "Hembree's ghostwriting by which he clothed his unilateral directives under the guise of official Navy guidance . . . to his intentional concealment of the true nature of Enabler 3.0 . . . ."   (JMOL Resp. 27 (alterations added); *see, e.g.*, Hembree Testimony Part II 22:7–24:4 (describing Hembree ghostwriting emails for Huskey)).   The Court agrees.   Viewing the evidence in the light most favorable to XTec, XTec presented sufficient testimony such that a reasonable jury could find Defendants acted deceptively.  *See Campbell*, 434 F.3d at 1312.

iii.   Lack of FDUTPA Damages

Finally, Defendants argue the Court should grant judgment in their favor on the FDUTPA claim because the jury failed to award XTec damages on this claim.   (*See* JMOL Mot. 25 (citing *Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824 (Fla. 4th DCA 2010) ("Proof of actual damages is necessary to sustain a FDUTPA claim"))).   In this regard, the jury agreed XTec proved Defendants were liable under the FDUTPA, but it awarded XTec "$0" in actual damages, and further specified the damages awarded to XTec under the FUTSA claim did not include FDUTPA-related damages.   (*See* Jury Verdict 3–4).   XTec disagrees with Defendants' argument, noting it sought injunctive relief in connection with its FDUTPA claim; thus, the jury's decision not to award monetary damages is not fatal.   (*See* JMOL Resp. 27; *see also* Compl. ¶ 56 (requesting injunctive relief as part of FDUTPA damages)).

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

The FDUTPA provides for both injunctive relief and monetary damages.  *See* FLA. STAT. § 501.211.  With respect to injunctive relief, the statute states "*anyone aggrieved* by a violation of this part may bring an action to . . . enjoin a person who has violated, is violating, or is otherwise likely to violate this part."  *Id.* § 501.211(1) (alteration and emphasis added). Regarding monetary damages, the statute states: "In any action *brought by a person who has suffered a loss* as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in [section] 501.2105."  *Id.* § 501.211(2) (emphasis and alteration added).

A plain reading of the statute indicates actual loss is only a prerequisite for plaintiffs seeking monetary damages.  *See id.*  The statute allows "anyone aggrieved by" a FDUTPA violation to seek injunctive relief, while only persons who have "suffered a loss" may seek actual damages.  *Id.*  A review of the case law supports this finding.  *See Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012) ("[R]egardless of whether an aggrieved party can recover 'actual damages' under section 501.211(2), it may obtain injunctive relief under section 501.211(1)" (alteration added)); *Big Tomato v. Tasty Concepts, Inc.*, 972 F. Supp. 662, 664 (S.D. Fla. 1997) (finding although the plaintiff did not have standing to pursue monetary damages under FDUTPA's section 501.211(2), it properly plead a cause for injunctive relief under section 501.211(1)).  Here, the jury found Defendants violated the FDUTPA through their false representations to XTec (*see* Jury Verdict 3), rendering XTec an "aggrieved" party pursuant to section 501.211(1).  The fact the jury did not award XTec actual damages for this claim simply negates Defendants' FDUTPA liability for monetary relief under section 501.211(2); it does not mean XTec did not prevail on its FDUTPA claim under section 501.211(1).

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

### 3.   The Defamation and Trade-Libel Verdicts

In its Complaint, XTec claims Defendants sent various defamatory emails regarding alleged difficulties concerning an Enabler 1.0 installation at a Navy base in Connecticut, which persuaded Navy personnel to upgrade to Enabler 3.0.  (*See* Compl. ¶¶ 69–75).  These emails blamed XTec for being "unable" to deliver a "simple reader," and referred to "phase 1" (a.k.a. "Enabler 1") of the project as not the "ideal solution."  (*Id.* ¶ 72).  Defendants also stated "phase 2" (a.k.a. "Enabler 3") of the project involved a new contractor, as a direct result of "problems" allegedly caused by XTec "dragging their feet;" and that such alleged difficulties are "why we are moving in a different direction."  (*Id.* ¶ 73).  The jury found such statements defamatory, awarding XTec $250,000 in nominal damages on this claim.  (*See* Jury Verdict 5).   Defendants claim the Court should enter judgment as a matter of law on both the defamation and trade libel claims because Defendants' statements were "true, substantially true, or pure opinion;" and because XTec failed to prove the elements of trade libel.  (JMOL Mot. 26).

### i.   Truth or Substantial Truth

A plaintiff cannot succeed on a defamation or trade libel claim if the allegedly defamatory statements are true or substantially true.  *See Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 706 (Fla. 3d DCA 1999) ("Under the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." (citations omitted)).  Defendants contend testimony or statements by Hembree, Huskey, and various Navy employees establish the alleged defamatory statements were true or substantially true, in that these individuals stated XTec failed to meet Navy requirements in a timely manner.  (*See* JMOL Mot. 27).  XTec argues the jury clearly rejected Hembree and Huskey's "self-serving testimony" as incredible, and instead chose to believe the testimony by XTec's witnesses indicating delays

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

were primarily due to infrastructural problems, not XTec.  (JMOL Resp. 28); *see also Johnson*, 484 F. Supp. 2d at 1245.

XTec also provided credible evidence supporting its assertion delays were largely due to issues outside its control.  Namely, XTec employees, Lisa Bussler and Tony Arner, testified the Navy's shifting needs rendered it impossible for XTec to adhere to its initial timelines.  (*See* Jury Trial Excerpt ("Bussler Testimony") [ECF No. 369] 9:13–17:16 (stating the Navy's changing requirements impacted XTec's ability to timely complete its tasks); *see also* Arner Test. Part VI 41:7–43:6 (describing how the infrastructural issues at the facility made it impossible for XTec to complete the Naval Academy project on time); 87:19–88:17 (describing how Defense Manpower Data Center's ("DMDC['s]") decision to change cards created the problems with the Navy sailors' cards in the galleys, not XTec)).  While Defendants also present credible evidence supporting their position, the Court is required to construe the evidence in the light most favorable to XTec.  *See Pickett*, 420 F.3d at 1278.  XTec presented sufficient evidence for a reasonable jury to find Defendants' statements were not true or substantially true.

ii.   Pure Opinion

Defendants also claim their statement Enabler 1.0 was not an "ideal solution" is not defamatory because it is pure opinion.  (JMOL Mot. 27).  "Pure opinion occurs when the defendant makes a comment or opinion based on facts which are set forth in the article or which are otherwise known or available to the reader or listener as a member of the public."  *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006) (quoting *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981)).  Nevertheless, "actionable mixed expressions of opinion and fact occur when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the article or assumed to

exist by the parties to the communication." *Donnelly v. McConnell*, No. 6:12-CV-670-ORL-22, 2012 WL 2402803, at *3 (M.D. Fla. June 26, 2012) (internal citations, quotation marks, and alteration omitted). Further, "if the facts upon which the opinion is based are stated in the article, but those facts are either incomplete or incorrect, or the speaker's assessment of them is erroneous, the statement . . . is not protected as pure opinion." *Johnson*, 484 F. Supp. 2d at 1247 (internal quotation marks omitted; alteration added).

According to Defendants, they conveyed all relevant facts to the Navy and explained Enabler 1.0 was inconsistent with the technical specifications and capabilities sought by the Navy. (*See* JMOL Mot. 28). Because the Navy was aware of the underlying facts behind the "ideal solution" statement, Defendants claim the statement is non-actionable pure opinion. (*See id.* (citing *Demby v. English*, 667 So. 2d 350, 355 (Fla. DCA 1995) (noting a statement may be pure opinion even if it does not provide the underlying facts, as long as the audience would be expected to know the underlying facts))). XTec insists it presented the jury with evidence Defendants inaccurately blamed XTec for delays outside of XTec's control and pre-textual noncompliance. (*See* JMOL Resp. 29).

To determine whether the "ideal solution" statement is pure opinion, the Court must analyze the context in which it was written. The email from Hembree to Kevin Boedigheim and Gil Ward — two Navy employees — states in part:

> I have engaged a contractor for Phase 2 of the project. I realize Phase 1 is far behind due to the inability of XTec to deliver a simple reader. They claim an excessive backlog at their manufacturing facility. If you remember Phase 1 would catch all of your population because they had to be put in a database for the local population. It worked with only the contact chip which required PIN. *This wasn't your ideal solution* but we agreed to go this route while we worked on Phase 2. . . . In [the Phase 2] solution any valid CAC would be scanned by a bar code reader and record the fact they went into your gym.

(Compl., Ex. B (alterations and emphasis added)).

The full context of the statement demonstrates Hembree was expressing an opinion Enabler 1.0 was not the Navy's ideal solution because it "worked with only the contact chip which required PIN" as opposed to working with "a bar code reader." (*Id.*) These underlying facts do not appear to be in dispute. (*See* Arner Test. Part VI 181:19–21 ("We don't do bar codes, not in the — not under the constraints of having to work on NMCI . . . .") (alteration added)). While the email refers to XTec's delays as well, the delays do not appear to form the basis of the statement that Enabler 1.0 was not the Navy's "ideal solution." (Compl., Ex. B). Even if the lack of bar-code capability was a pre-textual reason for Defendants and the Navy to replace Enabler 1.0, such a situation does not alter the fact that the "ideal solution" statement — in and of itself — is supported by true facts.[11] Thus, the "ideal solution" statement is protected as non-actionable pure opinion.

The finding that one of the allegedly defamatory statements is protected as pure opinion does not alter the jury's overall verdict on the defamation and trade libel claims. Notably, the verdict form did not separate out each allegedly actionable defamatory statement and accord each separate weight. (*See* Jury Verdict 4–5). Rather, the form simply asked the jury whether XTec proved Defendants "made false statements to the Navy regarding XTec's alleged inability to deliver card readers and alleged responsibility for causing delays in performing services for the Navy," to which the jury responded affirmatively. (*Id.* 4). As set forth *supra*, XTec provided credible evidence supporting its assertion delays were largely due to issues outside its control, from which a reasonable jury

---

[11] XTec argues evidence adduced at trial indicates Defendants were always aware XTec card readers did not support bar codes, yet Defendants did not communicate this point to personnel at the Groton submarine base. (*See* JMOL Resp. 29). Regardless of whether Defendants communicated this information or not, it does not change the fact Hembree could later express his opinion Enabler 1.0 was not the "ideal solution" because it lacked such capacity.

could have concluded Defendants' statements, taken as a whole, were defamatory, even if the phrase "ideal solution" was not.

### iii.    Trade Libel Elements

To state a valid claim of trade libel, a plaintiff must allege the defendant's published falsehood proximately caused the plaintiff special damages. *See Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1348 (M.D. Fla. 2006). In the trade libel claim section of the verdict form, the jury wrote XTec had proven Defendants engaged in trade libel; when asked for the total amount of special damages incurred to XTec's business, the jury wrote "$0." (Jury Verdict 5). The jury did award XTec $250,000 in nominal damages under the related defamation claim — a claim based upon the same defamatory statements as the trade libel claim, and predominantly the same elements. (*See id.* 4–5). Defendants argue because the jury did not award special damages to XTec under the trade libel claim, XTec failed to establish all elements of trade libel, and the Court should amend the judgment to reflect Defendants prevailed on the trade libel claim. (*See* JMOL Mot. 29).

In the Eleventh Circuit, a party seeking to challenge a jury's verdict as inconsistent must object to the issue before the jury is discharged, or else the issue is waived. *See Sands v. Kawasaki Motors Corp., U.S.A.*, 513 F. App'x 847, 857 (11th Cir. 2013) (where the plaintiff challenged as inconsistent the jury's finding that the defendant was liable but the plaintiff was not entitled to damages for pain and suffering, the court found the plaintiff waived this argument by not raising it before the jury was excused); *see also Walter Intern. Produc., Inc. v. Salinas*, 650 F.3d 1402, 1420 (11th Cir. 2011) (where the defendant attempted to assert post-trial the jury's awarding of zero damages was inconsistent with its finding of liability for breach of contract, the court held the issue had been waived because the defendant did not object before

the jury was excused.).  Similarly, here, Defendants attempt to challenge the jury's finding of no

special damages as inconsistent with its finding of liability for trade libel.  Because Defendants

did not raise this issue before the jury was discharged, it cannot be considered at this time.  *See*

*id.*

### B.  New Trial Motion

Defendants move for a new trial on the following grounds: (1) the verdict is contrary to

the great weight of the evidence; and (2) XTec's counsel committed misconduct that was

"beyond the pale and constituted plain or fundamental error."  (New Trial Mot. 2–4).  In the

alternative, Defendants request the Court reduce XTec's $250,000 award of nominal damages on

the defamation claim.  (*See id.* 8–10).  The Court turns to each argument.

### 1.  Verdict Contrary to the Evidence

### i.  XTec's Claims

Defendants incorporate by reference the reasoning from their JMOL Motion in arguing

the great weight of the evidence demonstrates Defendants: (1) did not misappropriate any of

XTec's trade secrets; (2) did not misappropriate XTec's trade secrets "willfully and

maliciously;"  (3) cannot be conflated with CardSmart; (4) did not cause XTec's purported actual

damages; (5) were not unjustly enriched; (6) did not violate the FDUTPA or cause any FDUTPA

damages; (7) did not defame XTec; (8) did not cause any special damages regarding alleged

trade libel; and (9) did not misappropriate a "substantial portion" of Enabler 1.0 or substantially

derive Enabler 3.0 from an earlier product.  (*See id.* 2–3).  Defendants also argue there was

insufficient evidence to support the awards of lost profits and unjust enrichment damages.  (*See*

*id.* 3).  Because Defendants rely on the same reasoning to support these arguments as in their

JMOL Motion, which the Court has rejected *supra*, the Court declines to grant a new trial on these bases.

### ii.   Defendants' Counterclaims

Defendants also argue they are entitled to a new trial on their defamation counterclaim. (*See id.*).   They assert the jury's finding that Rasco and Bimston did not act as XTec's agents in disclosing the Kennedy Report to the Navy is against the great weight of the evidence.   (*See id.*). Specifically, Defendants assert: (1) Florida law presumes an attorney acts as the client's agent regarding actions taken that are incidental to the lawyer's retention (*see id.* (citing, *e.g.*, *Dreggors v. Wausau Ins. Co.*, 995 So. 2d 547, 550–51 (Fla. 5th DCA 2008))); and (2) Rasco is not only XTec's lawyer, but also one of its officers and directors; thus, he clearly acted as XTec's agent in this matter.   (*See* New Trial Mot. 3–4).

Regarding the first point, Defendants cannot rely on their cited cases to supplant the jury's fact-finding with legal conclusions.   The jury was allowed to find Rasco and Bimston were not XTec's agents if Defendants failed to prove "by a preponderance of the evidence that XTec authorized these attorneys to act on its behalf regarding the disclosure of the report to the Navy's attorneys." (Jury Instructions 12).   Defendants approved this instruction, and cannot now request a new trial by suggesting this question is a matter of law rather than fact.   *See Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *30 (S.D. Fla. Oct. 31, 2007) ("A party who fails to raise an objection to a jury instruction or verdict form prior to jury deliberations waives its right to raise the issue on appeal.").

As to the second point, the record establishes: (1) Rasco and Bimston were XTec's attorneys at the time Bimston sent the Kennedy Report to the Navy (*see* Jury Trial Excerpt . . . ("Rasco Testimony") [ECF No. 371] 25:5–8); (2) Rasco supervises Bimston and was aware he

sent the Report, but did not necessarily direct him to do so (*see id.* 27:4–12 (work product objection sustained regarding whether Rasco told Bimston to send the Report)); (3) Rasco is an original investor and director of XTec, in addition to being one of its attorneys (*see id.* 5:15–6:4); and (4) Rasco testified he did not advise XTec about the transmission of the Kennedy Report to the Navy (*see id.* 37:2–4). It appears the evidence concerning whether XTec "authorized" Bimston to send the Kennedy Report is mixed as best.[12] On the one hand, Rasco, an attorney for and officer of the company, knew the Report was sent to the Navy. On the other hand, Rasco did not send the Report himself or discuss its transmission with the other XTec officers. With evidence on both sides, the Court declines to find the great weight of the evidence mandates holding a new trial on this issue. *See Ard*, 849 F.2d at 520.

    2.  XTec's Counsel's Purported Misconduct

    In determining whether an attorney's misconduct warrants a new trial, courts consider "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992) (internal citation omitted). "Generally, misconduct by trial counsel results in a new trial if the 'flavor of misconduct sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002) (quoting *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1994) (alteration in original)).

---

[12] Defendants attempt to rely on an admission from Plaintiff's Responses and Objections to Defendant HCSI's Court-Ordered Requests for Admission . . . [ECF No. 386-1], where XTec admitted the "act of XTec's counsel sending the Kennedy Report to the Navy was within the scope and authority of their attorney-client relationship with XTec." (*Id.* 3). However, as XTec points out in its New Trial Response, this document was never entered into evidence. (*See* New Trial Resp. 5).

Defendants called Rasco as a witness on November 16, 2016.  (*See generally* Rasco Test.).  Defendants argue Rasco's testimony deprived Defendants of a fair trial, as he: (1) improperly characterized evidence; (2) commented on Hembree's assets; (3) made improper arguments; and (4) referred to Hembree's discovery compliance.  (*See* New Trial Mot. 5–7).  The Court briefly lays out Defendants' factual bases for each category of purported misconduct below.

First, Defendants assert Rasco improperly characterized evidence during his testimony, for example, referring to an email between Hembree and Fisher as "an email between two coconspirators discussing how they are going to fool XTec into providing a server . . . ." (Rasco Test. 14:6–15:8 (alteration added)).  Similarly, when asked whether he knew if Hembree maintained this email in confidence, Rasco further described the email, stating: "It was between David Fisher, and it is almost like they are joking around about how we are going to fool XTec . . . .  And had they been honest, they would have said, XTec, we are not using you anymore and we are not [sic] going to use you to extract information so that we can make a competing product by misappropriating your code."  (*Id.* 16:18–24 (alteration added)).  Rasco also somewhat mischaracterized XTec's expert's testimony, stating Eiras determined Hembree and CardSmart conspired to gain access to XTec's code, when Eiras testified he had no opinion on what role Hembree played in the alleged misappropriation.  (*Compare id.* 19:5–11 *with* Eiras Test. Part I 65:16–18).

Second, Defendants argue Rasco improperly commented on Hembree's assets, testifying at one point: "I know Mr. Hembree has a lot of real estate.  I know he has laundries.  I know he has a television."  (Rasco Test. 24:9–13).  The Court struck this answer as non-responsive.  (*See id.* 24:14–15).  Rasco then added that Hembree "has many businesses."  (*Id.* 24:16–17).

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

Third, Defendants contend Rasco unnecessarily inserted several adversarial comments into his testimony. (*See* New Trial Mot. 6). For example, when asked whether the Navy was an important customer for Hembree, Rasco responded: "The Navy is an important customer to anybody who can do business with the Navy, including XTec, who worked very hard to deliver a reliable product to the Navy and used their own engineers rather than to copy, badly I might add, someone else's software." (Rasco Test. 23:20–24:1). Rasco also made a comment suggesting Hembree spoliated evidence (*see id.* 38:22–39:4), and interjected comments previously ruled inadmissible, such as that Hembree walked out of his deposition on three occasions (*see id.* 41:7–13).

Fourth, Defendants argue Rasco made improper references to Hembree's compliance with discovery in the CardSmart Litigation. (*See* New Trial Mot. 7; *see also* Rasco Test. 9:23–10:15).

The Court agrees Rasco took some improper liberties with his testimony. Specifically, he took the opportunity of his testimony to interject some adversarial rhetoric and insert several facts previously ruled inadmissible. Nevertheless, some of his comments, while vitriolic, were still relevant to the questions posed by Defendants' counsel. For example, Rasco's comments about the email between Hembree and Fisher were relevant to his testimony about whether he believed this document fell within the definition of confidential information — a topic Defendants' counsel raised. (*See* Rasco Test. 12:5–15:25); *see also United States v. Allen*, 772 F.2d 1555, 1556 (11th Cir. 1985) ("We have reviewed defense counsel's cross-examination of [the government witness] and agree with the district court that counsel's own questioning

brought about the comment objected to.  Defense counsel cannot complain of an alleged error invited or introduced by himself." (alteration added)).[13]

Further, the burden for requesting a new trial based on attorney misconduct is high.  Such burden is not met here.  To be clear, the Court does not find it "reasonably probable" the verdict was influenced by Rasco's statements.  *Fineman*, 980 F.2d at 207.  Most of Rasco's statements were similar to ones he made during his closing arguments, and Defendants had an opportunity to persuade the jury otherwise during their own closing arguments.[14]  The inadmissible statements Rasco interjected into his testimony, such as that Hembree walked out of his deposition three times, were not so unduly prejudicial as to affect the verdict.[15]  Rasco's testimony does not warrant a new trial of this case.

---

[13] Defendants argue their counsel's questions did not invite the kinds of adversarial responses Rasco provided.  (*See* New Trial Reply 4).  While it is true that some of Rasco's testimony was uninvited (*see, e.g.*, Rasco Test. 24:9–13 (unnecessarily discussing Hembree's assets)), some of Defendants' counsel's lines of questioning were open-ended enough to invite others of Rasco's responses (*see, e.g.*, *id.* 12:5–15:25 (Defense counsel asking Rasco about the definition of "confidential information" regarding a particular document, and Rasco elaborating on this question)).

[14] XTec also seeks to preempt Defendants' arguments regarding Rasco's testimony on the ground Defendants waived these arguments by failing to include them in their initial Rule 59(a) motion filed on December 16, 2015.  (*See* New Trial Resp. 6–7).  The Court need not address this point, as it has rejected Defendants' arguments on other grounds.

[15] *McWhorter v. City of Birmingham*, cited by Defendants, is distinguishable.  (*See* New Trial Reply 7 (citing 906 F.2d 674, 677 (11th Cir. 1990))).  In *McWhorter*, a former police officer sued the police chief, claiming he was discharged in retaliation for making statements to the press about the chief's abuse of a person in custody.  *See* 906 F.2d at 675.  The court granted the defendant's motion for a new trial when the plaintiff's counsel mentioned facts during his closing argument that the court had ruled inadmissible. *See id.* at 676–77.

   *McWhorter* differs from the present case in several ways.  First, the inadmissible facts were central to the case — evidence that the defendant fired the plaintiff because he refused to cooperate with the defendant in an ongoing lawsuit, as opposed to tangential mention of Hembree walking out of his deposition.  *See id.* at 676.  Second, there was actual evidence the jury was swayed by the plaintiff's counsel's mentioning of this evidence, in that the jury requested the inadmissible exhibit in question during its deliberations.  *See id.* at 676–78.  Here, there is no such evidence Rasco's comments swayed the jury.

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

3.   Nominal Defamation Damages

In the alternative, Defendants request the Court reduce the jury's award of $250,000 in nominal defamation damages.  (*See* New Trial Mot. 9).  "Nominal damages" are generally defined as "[a] trifling sum awarded when a legal injury is suffered but there is no substantial loss or injury to be compensated."  *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1291 (11th Cir. 2014) (citing *Black's Law Dictionary* (9th ed. 2009)) (alteration in original).  Courts typically consider damages in the amount of $1 or $100 to be "nominal."  *See Quainoo v. City of Huntsville, Ala.*, 611 F. App'x 953, 955 (11th Cir. 2015) ("[A] total of $4,000 in damages, while modest compared to the amount sought, far exceeded the damages amount ordinarily thought to be 'nominal' — $1 or $100." (alteration added)); *see also Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999) ("[N]ominal damages, of which $1 is the norm, are an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury." (alteration added)).  Further, when a court determines a jury instituted a verdict in excess of what the law permits, the court has a duty to correct it.  *See Corpus v. Bennett*, 430 F.3d 912, 916 (8th Cir. 2005) ("[T]he district court had a duty to make the nominal damages award conform to the law . . . .  The district court did not err in reducing the nominal damages award to one dollar." (alterations added; internal citation omitted)).

At trial, the Court provided the following instruction to the jury:

> If you find for XTec on its defamation claim but find that no damage to its business or reputation has been proved, you may award *nominal* damages. Nominal damages are damages of an *inconsequential amount* awarded to vindicate a right where a wrong is established but no damage is proved.

(Jury Instructions 10 (emphases added)).  This instruction was patterned from Florida's Standard Jury Instruction on defamation damages.  *See* FLA. STD. JURY INSTR. (Civ.) 405.10.

In its defamation verdict, the jury found XTec had proven Defendants made false statements to the Navy regarding XTec's inability to deliver card readers and responsibility for causing delays in performing services for the Navy, which statements tended to injure XTec's business or reputation.  (*See* Jury Verdict 4).  When asked for the total amount of money that would fairly and adequately compensate XTec for the damage, if any, to its business or reputation that was legally caused by Defendants' statements, the jury wrote "$0."  (*Id.*).  However, the jury was then asked: "Only if you did not award any damages in answering [the previous question], what amount of nominal damages, if any, do you award for XTec's defamation claim?" to which it wrote "$250,000."  (*Id.* 5 (alteration added)).

XTec argues the jury meant to award $250,000 in compensatory damages, rather than nominal damages and may have been confused because the jury instructions did not explicitly define "nominal damages."  (New Trial Resp. 11–12).  This argument fails to persuade.  The jury had clear instructions: (1) to award nominal damages "only if" it did not award compensatory damages (Jury Verdict 5); and (2) to only award nominal damages of an "inconsequential amount" (Jury Instructions 10).  Further, the cases cited by XTec are distinguishable.  First, in *Auwood v. Harry Brandt Booking Office, Inc.*, the Second Circuit reversed the trial court's reduction of $75,000 in nominal damages to $3.  *See* 850 F.2d 884, 893–94 (2d Cir. 1988).  In that case, however, there was clear evidence the jury meant to appropriate the amount as compensatory damages; in part, because the jury awarded separate amounts of money for three different year increments — *i.e.*, $67,0000 in nominal damages for the period of 1978–1981.  *See id.* at 887, 893.  Here, there is no such evidence the jury meant to award the amount as compensatory damages, and in fact, the verdict form expressly ordered it not to.

*Cory v. Greyhound Lines, Inc.*, 257 So. 2d 36 (Fla. 1971), and *Delva v. Value Rent-A-Car*, 693 So. 2d 574, 576 (Fla. 3d DCA 1997), also cited by Defendants, did not involve nominal damages, and are thus less relevant to the present situation.  Finally, *MTW Inv. Co. v. Alcovy Properties, Inc.*, cited by Defendants as well, is a decision by a state appellate court describing a more flexible definition for "nominal damages" applicable only in Georgia.  273 Ga. App. 830, 831 (2005).

XTec also argues Defendants have waived the nominal damages issue because, after the jury returned the verdict but before it was excused, the Court offered to resubmit this issue to the jury for clarification, and Defendants declined, opting instead to pursue the issue post-verdict. (*See* New Trial Resp. 12–13).  Because the Court orally allowed Defendants to address this issue post-verdict, it will not now deprive them of that opportunity.  Therefore, because the jury erred in awarding XTec nominal damages in the amount of $250,000, and the Court has a duty to correct jury damages so they conform to the law, it is appropriate to reduce the nominal damages to $1 in this case.  *See Corpus*, 430 F.3d at 916.

### IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** as follows:

1. The JMOL Motion **[ECF No. 352]** is **DENIED**.

2. The New Trial Motion **[ECF No. 353]** is **GRANTED in part** and **DENIED in part**. Defendants' request for a new trial is **DENIED**.  Defendants' request to reduce XTec's nominal defamation damages from $250,000.00 to $1.00 is **GRANTED**.

CASE NO. 14-21029-CIV-ALTONAGA/O'Sullivan

**DONE AND ORDERED** in Miami, Florida, this 28th day of April, 2016.

_____

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record